UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

BENJAMIN CABRERA,                                :

                         Petitioner,        :        **REPORT AND**
                                  **RECOMMENDATION**
        -against-        :        **TO THE HONORABLE**
                                  **LEWIS A. KAPLAN**

JOHN BURGE, Superintendent,            :
Auburn Correctional Facility,            04 Civ. 6158 (LAK)(FM)
                              :
                    Respondent.
---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.    <u>Introduction</u>

        Pro se petitioner Benjamin Cabrera ("Cabrera") brings this habeas

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction,

on one count each of Attempted Aggravated Assault on a Police Officer, Assault in the

Second Degree, Criminal Possession of a Weapon in the Second Degree, and Reckless

Endangerment in the First Degree, following a jury trial in Supreme Court, Bronx County.

On April 6, 1999, Justice Richard Lee Price, before whom the case was tried, sentenced

Cabrera as a persistent violent felony offender to prison terms which, in the aggregate,

amounted to a sentence of fifty years to life.

        In his petition, Cabrera advances both claims previously raised on his direct

appeal, arguing that the trial court improperly failed to conduct an inquiry into one juror's

1

alleged refusal to participate in deliberations or set aside the verdict on the basis of a different juror's alleged misconduct.  (See Pet. ¶ 12).  As set forth below, neither of these claims warrants habeas relief.  Accordingly, Cabrera's petition should be denied.  Additionally, Cabrera should be denied a certificate of appealability because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

II.    Background

    A.    Trial

_____In his reply memorandum, Cabrera concedes that "[t]his is a case where the issue of what did or did not happen at trial is irrelevant."  (Pet'r's Reply Mem. at 6).  Because Cabrera is correct that the details of his crimes do not affect his entitlement to relief, the evidence adduced at trial need be described only briefly.[1] _____

---

[1]    Portions of the relevant state court transcripts were filed with the Court, but others apparently were unavailable.  (See Aff. of Ass't Dist. Att'y Lynetta St. Clair, sworn to on Nov. 16, 2004 ("St. Clair Aff."), ¶ 12; Docket Nos. 7-12).  Additionally, some volumes which were filed can no longer be located.  Accordingly, as Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Courts expressly allows, I have relied on the state court appellate briefs and the incomplete transcript before this Court in order to prepare this Report and Recommendation.  See Day v. Taylow, 459 F. Supp. 2d 252, 254 n.2 (S.D.N.Y. 2006).  I also have taken the liberty of not citing to the briefs and transcripts in this summary of the evidence.  Where citations appear elsewhere in this Report and Recommendation, "Tr." refers to the transcript of the jury trial, "H." refers to the transcript of the post-trial hearing on October 28 and November 2, 1998, regarding alleged juror misconduct, "S." refers to the minutes of the sentencing of Cabrera and his co-defendant on April 6, 1999, and "Ex." refers to the Exhibits annexed to the St. Clair Aff.

1.    People's Case

The People's proof would have enabled a reasonable juror to find as follows: Carlos Estrella ("Estrella") was walking to his sister's apartment building in the Bronx on the night of April 12, 1996, when he was approached by Benjamin Cabrera ("Cabrera") and Domingo Velasquez ("Velasquez"), each of whom was carrying a gun. Displaying a single shield, Cabrera and Velasquez at first identified themselves as police officers, but then demanded Estrella's money and watch. In the course of robbing Estrella, the two men also struck his head with their guns. In an effort to retrieve more money from Estrella, Cabrera and Velasquez insisted that he take them to his apartment. The three men eventually arrived at the door of an apartment occupied by Estrella's sister, but she refused to open the door. Cabrera and Velasquez then dragged Estrella outside the building and started to walk him down the street.

Police Officers John Farry and Keith Cummings were on radio patrol in the vicinity of the apartment building and saw Cabrera and Velasquez pushing Estrella along the street. They also observed that Estrella was "covered in blood." Moments later, Estrella escaped from his assailants and ran to the squad car, yelling "help me, help me, they are robbing me." Soon thereafter, Cabrera ran behind the patrol car and fired his gun. After radioing for assistance, Officer Farry pursued Cabrera. Midway up the block, Cabrera turned and fired a shot at Officer Farry. Approaching the corner, Cabrera again

3

fired at Officer Farry before being arrested in a nearby building.  The police later recovered a loaded gun in a stairwell that Cabrera had passed while he was attempting to flee.  Also found along the path that Cabrera had followed were two shell casings, a bullet fragment, and a bullet mark.

Velasquez was apprehended by other officers after he dropped a duffle bag containing an operable gun.  The police recovered a Wells Fargo shield from Velasquez's person.

2.    Defense Case

The defense did not call any witnesses.

3.    Jury Deliberations and Verdict

The jury began its deliberations on the evening of October 7, 1998.  Late the following day, the jurors sent the court a note (Court Exhibit 11) which stated that "Juror number six feels he cannot continue to deliberate with the rest and wishes to be excused." (Tr. 1714).  Before responding to the note, Justice Price asked counsel, "Anybody have any i[n]put on that other than I am just going to tell him that he must continue?" (Id.).  Cabrera's counsel responded, "Nothing else." (Id.).  Thereafter, when the jury reentered the courtroom, the Justice read the note aloud before stating, "That is a wish that will not be granted, you must continue to deliberate." (Id. at 1716).

Still later that evening, the jury sent Justice Price another note (Court Exhibit 12) which requested a written version of one of the court's instructions.  The note

also reported that "Juror number six is acting hostile and refuse[s] to participate in deliberations." (Id. at 1725). After an off-the-record discussion with counsel, Justice Price read the contents of the note aloud to the jurors. He then told them that he could not give them a portion of his charge in writing.[2] (Id. at 1724-25). With respect to Juror Number Six, the court stated, "That's why you are going to cease your deliberations now . . . , you are to try and relax and we will see you in the morning." (Id. at 1725). After excusing the jurors for the night, the court held an off-the-record sidebar conference with counsel, after which he quickly recalled the jurors to the courtroom so that he could explain that his decision to have the jury retire for the night was "not for any specific reason" and not "because juror number six [was] refusing to participate in the deliberations." (Id. at 1726).

On the morning of October 9, 1998, at approximately 10:05 a.m., the jury asked for a readback of a portion of the court's charge. (Id. at 1727). Closer to noon, Cabrera's counsel moved for a mistrial on behalf of both defendants, arguing that "the open hostility of . . . juror number six has so negatively influenced the jury that . . . he qu[i]te possibly intimidated them both physically and emotionally to the point they couldn't basically continue their deliberations in an independent manner." (Id. at 1727-

---

[2]        Under New York law, it is clear that a judge may not give a <u>portion</u> of the court's charge to the jury in writing. <u>See, e.g.</u>, <u>People v. Owens</u>, 69 N.Y.2d 585, 590-91 (1987). The New York Court of Appeals has yet to determine whether the submission of an <u>entire</u> charge to a jury in writing, an event which is common in this District, constitutes reversible error. <u>See id.</u> at 590 n.*.

35).  In the alternative, counsel requested that the court conduct a "juror by juror inquiry" as to whether the recalcitrant juror had negatively affected their deliberations.  (Id. at 1729).  In the course of making this application, counsel contended that, "[d]uring the readback of the charges, [Juror Number Six] was – basically his head was down.  He was obviously alienated, and . . . didn't want to hear about anything."  (Id. at 1728).  Counsel added that as the jury was leaving the courtroom, Juror Number Six actually "tried to approach the [c]ourt," although that attempt was rebuffed.  (Id.).  After hearing from Velasquez's counsel and the prosecutor, who disputed the suggestion that Juror Number Six was anything other than tired, (id. at 1733-35), Justice Price denied both defendants' applications, stating that he would not "invade the sanctity of the jury room," (id. at 1736).

Later that day, the court received a note stating that the jurors were "deadlocked."  (Id. at 1741).  The note made no mention of Juror Number Six, however. In response to the note, Justice Price delivered a "modified Allen charge" and instructed the jury to continue its deliberations.  (Id. at 1741-42, 1749-52).

The jury reached its verdict the following afternoon.  (Id. at 1764).  The jurors acquitted Cabrera on five counts charging him with Attempted Murder in the First and Second Degrees, Attempted Assault in the First Degree, Robbery in the First Degree, and Criminal Impersonation in the First Degree, but found him guilty on the remaining counts charging him with Attempted Aggravated Assault on a Police Officer, Assault in

the Second Degree, Criminal Possession of a Weapon in the Second Degree, and

Reckless Endangerment in the First Degree.  (Id. at 1765-67).  Velasquez was acquitted

on a count charging him with Robbery in the First Degree, but was found guilty on counts

charging him with Assault in the Second Degree, Criminal Possession of a Weapon in

the Second Degree, and Criminal Impersonation in the First Degree.  (Id. at 1764-65).

B.    Post-Trial Proceedings

Moments after Justice Price discharged the jury, Velasquez's counsel

informed the court that Velasquez's wife had been in contact with a person whom he

described as the "girlfriend" of Juror Number Five while the trial was underway.  (Id. at

1776-77).  Counsel explained that Velasquez's wife had received assurances from the

girlfriend that Velasquez would be acquitted and had first advised him of the contact after

the jury returned its verdict.  Despite the prosecutor's objections, Justice Price determined

that an inquiry into Velasquez's allegation of potential juror misconduct was appropriate.

(Id. at 1780-81).  Thereafter, at Justice Price's direction, Cabrera filed a formal motion

pursuant to Section 330.30 of the New York Criminal Procedure Law ("CPL") in which

he asked the court to set aside the verdict, or, in the alternative, grant a hearing on the

basis of alleged impropriety concerning Juror Number Five.[3]  (See Ex. 7).

The post-trial hearing began on October 28, 1998, and continued the

following day.  (See H. 19, 126).  The first witness was Velasquez's wife, Anita Colon

---

[3]       Velasquez apparently joined in this motion.  (See Ex. 9 at 18).

("Colon").  Colon testified that a woman named Mary Betancourt ("Betancourt") had approached her in a courthouse bathroom during the trial and had introduced herself as the "lover" of Juror Number Five (a female juror).  (Id. at 32).  According to Colon, Betancourt told her that Juror Number Five had asked her to tell Colon, "don't worry, your husband's innocent."  (Id. at 32-33).  Colon testified that Betancourt also had asked Colon for her telephone number, but that she intentionally gave Betancourt the wrong number because she was "nervous" and "didn't actually know who [Betancourt] was." (Id. at 33).  Colon stated that she had a second conversation with Betancourt later in the trial while Estrella's sister was testifying.  At that time, Betancourt allegedly "made eye contact" indicating that "she had something to tell [Colon]."  (Id. at 34).  Colon testified that as they walked together toward the bathroom, Betancourt stated that she was "sincere" and complained that Colon had not provided her with her correct telephone number.  (Id.).  Colon testified that she apologized.  Betancourt then allegedly said that "she was going to talk to her lover."  (Id. at 34-35).  According to Colon, Betancourt also said that the jury would acquit Velasquez, but convict Cabrera "because he looks like a killer."  (Id. at 35).  Following this discussion, Betancourt and Colon exchanged telephone numbers.  (Id.).  Colon was able to recite Betancourt's number during her testimony without consulting any documents.  (Id.).

Colon testified that Betancourt subsequently called her three or four times. (Id. at 37, 69).  During these conversations, Betancourt allegedly told Colon that "she was

going to speak to her lover . . . to see if . . . she could convince the other jur[ors] to find [Velasquez] not guilty." (Id. at 36). Colon testified that, despite this offer, she never asked Betancourt to speak with Juror Number Five or to encourage Juror Number Five to find Velasquez not guilty. (Id. at 39).

According to Colon, there also was an occasion when she saw Betancourt and Juror Number Five walk together from the hallway outside the courtroom into an elevator. (Id. at 39-40). Colon stated that her daughter, Maribel Pagan ("Pagan"), was with her when this occurred. (Id. at 40).

Colon asserted that Betancourt called her on October 9, 1998, while the jury was deliberating, stating that she did not know what was happening and that her lover was staying in a hotel. (Id. at 40-41). According to Colon, Betancourt then said that she had to hang up because she was receiving a call from Juror Number Five. (Id. at 41). Colon testified that Betancourt later called her back, but again terminated the call "because three officers just walked in with [her] lover to pick up clothes." (Id. at 42).

Pagan, who was a high school student at the time of the trial, confirmed that she saw a woman named Mary in the courthouse on one occasion. (Id. at 129-30). At that time, Mary was waiting for Colon in a hallway, but Juror Number Five called out to Mary, who then entered the elevator with Juror Number Five. (Id. at 132-33). Pagan also testified that Mary had telephoned her house on several occasions to speak to her mother. (Id. at 133). Colon advised Pagan that Mary was Juror Number Five's lover, but Pagan

9

was not privy to the content of any of Mary's conversations with Colon in the courthouse or over the telephone, nor did Colon enlighten her during the trial as to the substance of those conversations.  (Id. at 145-46, 177-79, 184-85; see also id. at 212).

The next hearing witness was Juror Number Five, Melissa Nieves, who acknowledged that she was a lesbian, but denied that Betancourt was her lover, explaining that they were merely friends.  (Id. at 228, 230).  Nieves testified that she had known Betancourt (who lived in her father's building in Manhattan) and other members of Betancourt's family, for approximately two years.  (Id. at 230-31, 256-58).  After the first four or five days of trial, Nieves asked Betancourt to join her for lunch because she was bored.  (Id. at 232).  The two had lunch together later that day.  Nieves testified that Betancourt returned to the courthouse the following day to surprise Nieves by taking her out to lunch.  (Id. at 234).  Nieves stated that she nevertheless had not entered a courthouse elevator with Betancourt or met her in a courthouse hallway.  (Id. at 242-43).

Nieves testified that she did not recall seeing Betancourt in the courtroom following their two lunch dates.  (Id. at 236).  She testified further that she never discussed the case with Betancourt.  (Id. at 233, 237).  In particular, Nieves said that she never asked Betancourt to contact Colon and was unaware that Betancourt had spoken with her.  (Id. at 237).  Indeed, Nieves said that she did not speak with Betancourt following the second lunch until after the trial was over.  (Id. at 239).

10

According to Nieves, the jurors were sequestered in a hotel in New Rochelle during their deliberations. (Id. at 244). On the second night of their sequestration, court officers took Nieves to her apartment so that she could retrieve additional clothing. (Id. at 247). Nieves testified that her sister was in her apartment when she arrived, but that Betancourt was not. (Id. at 253).

Betancourt also was called as a witness at the hearing. She testified that she first encountered Colon in a courthouse bathroom after Betancourt asked Colon to pass her some toilet paper because there was none in her stall. (Id. at 324). After they began to converse, Betancourt explained that "one of [her] girlfriends [was] one of the jurors." (Id. at 326). According to Betancourt, during this conversation, Colon provided her with her name and number and asked Betancourt to give her a call, explaining that her husband was one of the defendants on trial. (Id. at 324-25). Betancourt testified that she called Colon only once, at which time Colon offered her money – or anything else she wanted – to convince Nieves to "bribe the rest of the jurors." (Id. at 346). Betancourt stated that she declined this entreaty. (Id. at 346, 361). She testified that Colon also told her that Cabrera and Velasquez "beat up" Estrella "because he owed money to them" as a consequence of a cocaine deal. (Id. at 346). Betancourt said that, despite having been given this information, she never discussed the case with Colon or told her about her contacts with Nieves. (Id. at 335-36, 338-39, 359-60).

11

The post-trial hearing resumed on November 2, 1998. (Id. at 377). At the outset of that session, Justice Price reported to counsel that Betancourt had been waiting for him in the robing room at the conclusion of the second day of the hearing. At that time, Betancourt volunteered that she had in fact been at Nieves' apartment when Nieves went there during the course of the jury's deliberations. (Id. at 377-78). The Justice stated that Betancourt had explained that she was "watching her apartment" because they were "very good friends." (Id. at 378, 385). Although the Justice did not ask her any follow-up questions at that point, he later learned that Nieves told court personnel that she was "surprised" to see Betancourt in the apartment, and that "her sister" had let her in. (Id. at 378).

Immediately after making this disclosure, Justice Price recalled Betancourt to the stand for further questioning.[4] During this appearance, unlike her first stint as a witness, Betancourt was represented by an attorney appointed by Justice Price to counsel her. Betancourt recanted a portion of her prior testimony, admitting that she was in Nieves' apartment when Nieves arrived there with the court officers. (Id. at 386, 388, 398-99). Betancourt explained that she had been let into the apartment by Nieves' sister

---

[4]    During the hearing, the defendants called Colon and Pagan as witnesses. Justice Price called Betancourt, Nieves, two court officers, and all of the jurors as court witnesses. (See Ex. 9 at 2).

Shavone,[5] who left to go to a store before Nieves arrived.  (Id. at 386, 419).  Betancourt

testified that she believed that it was important to tell Justice Price the she had been in

Nieves' apartment "[b]ecause it was the truth."  (Id. at 404).

      Following Betancourt's testimony, the court recalled Nieves, who also had

the benefit of conferring with appointed counsel before her continued testimony.  (Id. at

417).  Nieves testified that when she arrived at her apartment with the court officers, she

"was surprised that anybody was inside."  (Id. at 419).  Betancourt explained to her,

however, that Shavone had "stepped out" to "get something to eat."  (Id.).  Nieves

maintained that she and Betancourt did not discuss the case at that time.  (Id.).  She

explained that she gave false testimony about Betancourt during her initial hearing

appearance because she had no idea why she had been summoned to court and "didn't

want to have nothing to do with [her]."  (Id. at 420).

      Following the hearing, Justice Price issued a written decision, dated March

26, 1999, in which he denied the defendants' motions to set aside the verdict pursuant to

CPL § 330.30 because they had "failed to sustain their burden of proof that [jury]

misconduct occurred."  (Ex. 9 at 14).  In his decision, the Justice conceded that "Colon,

Betancourt and [Nieves] all had some degree of difficulty being truthful."  (Id. at 11).  In

particular, he noted that both Betancourt and Nieves initially had lied when they were

---

     [5]      The transcript describes Shavone as "my little sister," but this appears to be a error
in the transcription of "Melissa's sister" (i.e., Nieves' sister).  "Shavone" is also spelled
"Shevon" elsewhere in the transcript.  (See, e.g., id. at 403).  In his post hearing decision, Justice
Price used the spelling "Shavon."  (Ex. 9 at 6).

asked whether Betancourt had been in Nieves' apartment when Nieves went there during
deliberations.  The Justice concluded, however, that this was attributable to their mistaken
belief that "Betancourt was in serious trouble as a result of her conversations with
Colon."  (Id.).  He noted that once they met with counsel who explained the nature of the
hearing to them, both Betancourt and Nieves "owned up to truth" and gave similar
accounts of what had occurred.  (Id.).

    Justice Price further concluded that Colon's testimony was not credible.
The Justice noted Colon's obvious self interest, which led her to try to reach Nieves
through Betancourt in order to "manipulate the jury," and to seek to set aside the verdict
when that effort failed.  (Id. at 12).  The Justice also observed that there was irrefutable
proof that Colon had lied during a critical part of her testimony.  As he explained, Colon
testified that she never told Betancourt what had led to the assault on Estrella.  During her
hearing testimony, however, Betancourt testified that Colon had told her that the assault
was related to a cocaine deal.  This explanation of the motive for the attack was consistent
with Cabrera's post-arrest statement to the police, but was not something that Betancourt
could have learned during the trial because there was no testimony about a cocaine deal.
(Id. at 3, 12).  The Justice noted that, contrary to Colon's testimony, Nieves also could not
have predicted the outcome of the trial "weeks before deliberation[s] began" since all of

14

the jurors testified that there was "no discussion about guilt or innocence prior to deliberations."  (Id. at 13).[6]

Finally, Justice Price noted that, even if Colon's testimony were to be accepted at face value, "there was not one iota of evidence that Betancourt and [Nieves] ever spoke about the case."  (Id. at 14).  He further noted that, even if such conversations had occurred, the record established that the jury's deliberations and verdict were not affected.  (Id. at 17).  As the Justice explained, the "lengthy deliberations and the split nature of the verdict itself (finding [the defendants] not guilty on a number of counts), indicate[d] that the jury weighed the evidence carefully and made its determinations based upon the evidence at trial and not the simple notion that one of the defendants 'looked guilty.'" (Id.).  The Justice noted that the "suggestion that [Nieves] may have had an unduly strong influence on the deliberative process" was also belied by the inability of many of Nieves' fellow jurors even to recall who she was.  (Id.).

B.    Sentencing

The sentencing of both defendants took place on April 6, 1999.  (S. 1).  Cabrera was sentenced, as a persistent violent felony offender, to indeterminate terms which, in the aggregate, amount to a sentence of fifty years to life.  (Id. at 31-32).  Velasquez, who had fired no shots, was sentenced, as a persistent violent felony offender,

---

[6]    Although the hearing transcript submitted to the Court evidently included the testimony of all of Nieves' fellow jurors, that volume is missing from the court file.

to a term which, in the aggregate, amounted to a sentence of twenty-seven years to life.
(Id. at 14-15).

      C.      Subsequent Procedural History

      Cabrera appealed his conviction to the Appellate Division, First
Department, raising both of his claims regarding the trial jurors. (See Pet. Attach.). On
May 20, 2003, the Appellate Division unanimously affirmed his conviction. See People
v. Cabrera, 761 N.Y.S.2d 21 (1st Dep't 2003). The Appellate Division concluded that
Justice Price had exercised his discretion appropriately in denying Cabrera's application
for a mistrial, or, in the alternative, to question all of the jurors individually in response to
the notes concerning Juror Number Six. As the court noted, "whatever problem this juror
may have had soon resolved itself." Id. at 22. The Appellate Division further found that
Cabrera had failed to preserve his "remaining contentions concerning the court's handling
of this situation." Id. The Appellate Division added that if it were to review those claims
in the interest of justice, it would reject them. Id.

      The Appellate Division also affirmed the trial court's denial of Cabrera's
motion to set aside the verdict on the basis of the post-trial revelations concerning Juror
Number Five because its credibility determinations were supported by the record. The
Appellate Division further observed that, "even if the juror at issue was less than
completely forthright, there was no misconduct that affected a substantial right of a
defendant." Id.

16

By letter dated May 21, 2003, Cabrera sought leave to appeal to the New York Court of Appeals, alleging that his case presented "important issues regarding the conduct of jurors." (Ex. 2). In a second letter to Associate Judge Victoria A. Graffeo, dated June 5, 2003, Cabrera urged that he be granted leave to appeal so that the court could consider (1) whether a formal inquiry was necessary because a juror may have been "grossly unqualified" to serve, and (2) whether a juror who lies under oath must always be dismissed from the jury. (Ex. 3). Thereafter, on June 26, 2003, Judge Graffeo denied Cabrera's leave application. People v. Cabrera, 100 N.Y.2d 560 (2003).

Cabrera's habeas petition is dated May 24, 2004, and was received by the Pro Se Office of this Court the following month.[7] (See Docket No. 1). The petition therefore is timely. In his petition, Cabrera repeats his earlier claims that the trial court improperly refused to (1) conduct an inquiry regarding a juror who allegedly refused to participate in deliberations, or (2) set aside the verdict after another juror "lied." (Pet. ¶ 12).

III.    Discussion

A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. Herrera v. Collins, 506 U.S. 390, 401 (1993). Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the

---

[7]    The Pro Se Office "received" stamp reads "June X 2 2004." (See Docket No. 1).

evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated. See Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly

18

established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d. at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that: "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

B.    Cabrera's Claims

1.    Juror Number Six

Cabrera's first claim is that the trial court's failure "to conduct an inquiry of the juror who refused [t]o deliberate" constitutes a violation of CPL § 270.35(1), which

19

requires a trial judge to discharge a juror if the judge finds from facts unknown at the time

of the jury's selection that the juror is "grossly unqualified to serve in the case."  Cabrera

further contends that the trial court's failure to discharge the juror pursuant to this statute

deprived him of his rights to due process and a fair and impartial jury trial in violation of

the Fifth and Fourteenth Amendments to the United States Constitution.  (See Pet. ¶ 12.A

& Attach. at 16).

        Both of the jury's notes expressing concern about Juror Number Six were

sent to the court during the second day of deliberations.  In keeping with the

recommended federal practice, see United States v. Ronder, 639 F.2d 931, 934 (2d Cir.

1981), Justice Price conferred with counsel before responding to each note.  In response

to the first note, Justice Price told the jurors that they had to continue to deliberate.  (Tr.

1716).  In response to the second note, Justice Price initially told the jurors that they

would be excused for the day.  (Id. at 1724).  There is no indication that Cabrera's

counsel made or joined in any requests for other instructions, or sought any other relief,

before this occurred.  (Id. at 1724-25).

        After Justice Price explained to the jurors that Juror Number Six's

demeanor was the reason that they were ceasing their deliberations for the day,

Velasquez's attorney asked for a sidebar conference which led to an off-the-record

discussion.  (Id. at 1725).  Following that discussion, Justice Price recalled the jury and

told them that Juror Number Six's behavior was not the reason he had decided to declare

a recess in their deliberations.  (Id. at 1726).  Once again, there is nothing in the record to suggest that either defense lawyer made any requests before this occurred, other than possibly an off-the-record request not to lay the blame for Justice Price's decision on Juror Number Six.

The following day, the jury sent another note at 10:05 a.m., asking for a portion of the jury charge to be reread.  (Id. at 1727).  That note made no further mention of Juror Number Six, nor did it indicate that the jury was having any continuing difficulties regarding its deliberations.  Although both defense counsel subsequently moved for a mistrial on the basis of the alleged "hostility" of Juror Number Six, the transcript indicates that this application was made closer to noon, by which time there still was no indication that the jury had any further issues related to Juror Number Six.  (See id. at 1728-35).  Justice Price therefore denied the mistrial motion, stating that he would respond to the request to reread certain of his instructions and "if something else comes out, . . . [would] go from there."  (Id. at 1736).

Cabrera now contends that Juror Number Six should have been individually queried to determine whether he was "grossly unqualified to continue to serve as a juror." (Pet. Attach. at 16).  Although both defense counsel requested that the entire jury be questioned unless a mistrial were granted, they never asked that Juror Number Six alone be questioned.  The respondent contends that Cabrera's present failure-to-question claim is therefore procedurally defaulted.

21

A federal court is precluded from reviewing a petitioner's claim in a habeas proceeding if the last state court to hear the case concluded that the claim was procedurally defaulted – unless the petitioner can demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).  A procedural default in state court will bar such review, however, only if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989) (internal quotations omitted); accord Fama, 235 F.3d at 809.  In that circumstance, the petitioner is barred from seeking habeas relief even though the state court has ruled in the alternative on the merits of his federal claim.  Glenn, 98 F.3d at 724 (quoting Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990)).

In determining whether they may hear a state prisoner's habeas claim, courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" Garlaza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Stinson, 229 F.3d at 118).  Here, the Appellate Division stated that Justice Price exercised his discretion properly in denying the defendants' "application for a mistrial or for

individual inquiries as to whether one juror had intimidated the others and affected their deliberations." Cabrera, 761 N.Y.S.2d at 22.  The Appellate Division further held that Cabrera's "remaining contentions concerning the court's handling of this situation [were] unpreserved." Id.  One of those contentions was that Juror Number Six should have been individually questioned to determine whether he was "grossly unqualified." Id.  Cabrera's failure to preserve that claim constitutes an adequate and independent state ground for its denial.  Accordingly, Cabrera's claim concerning Juror Number Six is procedurally barred.  See Blue v. Duncan, No. 03 Civ. 1202 (LTS)(GWG), 2004 WL 1172793, at *11 (S.D.N.Y. May 27, 2004) ("[F]ederal habeas courts have routinely refused to consider claims rejected as unpreserved by the New York State courts on the ground that the defendant failed to alert the court to the specific issue being raised for review.").

> To overcome a procedural default, a petitioner must establish both cause for the default and actual prejudice, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  The circumstances giving rise to cause include (a) interference by government officials which makes compliance impracticable, (b) situations in which the factual or legal basis for a claim

was not reasonably known by counsel; and (c) ineffective assistance of counsel.  See

Murray, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994).  A showing

of prejudice requires a petitioner to demonstrate that the failure to raise the claim

previously had a substantial injurious effect on the petitioner's case such that he was

denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL

1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to establish a fundamental miscarriage

of justice, a petitioner must demonstrate that he is "actually innocent."  Aparicio v. Artuz,

269 F.3d 78, 90 (2d Cir. 2001).

Cabrera's petition does not identify any reasons external to the defense

which might excuse his failure to make a timely request that Juror Number Six be

individually voir dired.  Moreover, Cabrera has not shown that he suffered any actual

prejudice as a result of Justice Price's decision not to question that juror.  (Indeed, the

verdict that the jurors, including Juror Number Six, returned resulted in the acquittal of

Cabrera on the two most serious charges (Attempted Murder in the First and Second

Degrees).)  Finally, Cabrera's petition does not suggest that he is actually innocent of the

charges on which he was convicted.  The Court therefore cannot consider Cabrera's

failure-to-question claim.

Of equal importance, even if Cabrera's claim with respect to Juror Number

Six had not been procedurally defaulted, Cabrera has failed to show, as he must, that

Justice Price's handling of the juror notes and the defense's application for a mistrial

24

were contrary to, or an unreasonable application of, existing Supreme Court case law. Indeed, it is settled law in this Circuit that a trial judge has "considerable discretion" in deciding how to deal with jury issues.  See, e.g., United States v. Parker, 903 F.2d 91, 101-02 (2d Cir. 1990) (mistrial properly denied without any further inquiry despite note in which one juror asked to be excused from further service because the jury was "incapable of understanding" the court's instructions); United States v. Barnes, 604 F.2d 121, 143-45 (2d Cir. 1979) (trial judge did not abuse discretion by failing to dismiss or voir dire a juror alleged to have raised his middle finger in the direction of defense counsel while he displayed a facial "expression" indicating "distaste" for counsel).  Justice Price plainly did not abuse that discretion here because (a) the jury had sent a note (before the application for a mistrial or to question all of the jurors was made) which indicated that the jurors were continuing their deliberations; (b) those deliberations continued without any further complaints about Juror Number Six for another two days; and (c) the jury reached a unanimous verdict, the results of which were confirmed by polling each of the individual jurors.

Accordingly, Cabrera is not entitled to habeas relief on the theory that Justice Price should have questioned Juror Number Six individually while the jury was deliberating to determine whether the juror was "grossly unqualified" to serve.

2.    Juror Number Five

Cabrera's only other claim is that the trial court improperly refused to set aside the verdict after it learned that a "juror had lied." (Pet. ¶ 12.B). Taking issue with Justice Price's determination that there were no improper communications between Betancourt and Nieves, Cabrera suggests that "it is more likely that [they] had discussed the information from Colon, and that is why they were lying about their contacts." (Pet. Attach. at 24).

If this were a direct appeal from a conviction in a federal criminal case, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury . . . [would have to be] deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial." Remmer v. United States, 347 U.S. 227, 229 (1954) (emphasis added). This case, however, comes before the Court on habeas review. Accordingly, the factual findings of the state court must be presumed to be correct. 28 U.S.C. § 2254(d)(2). Moreover, the statutory presumption of correctness can be overcome only if Cabrera is able to adduce clear and convincing evidence to the contrary. Id. In his papers, however, Cabrera merely speculates that Colon and Betancourt had "a greater relationship" than the one they admitted, that they discussed Cabrera's "guilt based upon evidence outside the [record]," and that this "could have potentially influenced Nieves' verdict." (Pet. Attach. at 24). Such sheer conjecture

26

that there was an improper contact with Nieves plainly is insufficient to meet Cabrera's burden.

Cabrera also argues that the lie that Nieves told necessitates the reversal of his conviction to preserve the sanctity of the jury system, even if the jury's verdict was not affected. (See Pet. Attach. at 22 ("The juror's lie undermine[s] the assurance that [Cabrera] received a fair trial. That is why [the New York Court of Appeals] has consistently demanded dismissal of jurors who are caught in such lies.").  However, Cabrera has not drawn the Court's attention to any decision of the United States Supreme Court that requires such a drastic result. As Justice Holmes declared nearly one hundred years ago in affirming the denial of a new trial, "[i]f the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain [a] jury trial under the conditions of the present day." Holt v. United States, 218 U.S. 245, 251 (1910). Here, the trial judge found that Cabrera's post-trial proof of misconduct consisted of little more than smoke and mirrors, which, in the absence of any showing of actual prejudice, did not entitle him to set aside the verdict.  This decision has not been shown to be contrary to, or an unreasonable application of, Holt or any more recent decisions of the Supreme Court.

Accordingly, Cabrera is not entitled to habeas relief based on the actions of Juror Number Five or her alleged influence on her fellow jurors.

IV.    Conclusion

For the foregoing reasons, Cabrera's habeas petition should be denied. Additionally, Cabrera should be denied a certificate of appealability because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten (10) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (e). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Kaplan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:    New York, New York
          May 14, 2007

_____
FRANK MAAS
United States Magistrate Judge

28

Copies to:

Honorable Lewis A. Kaplan
United States District Judge

Benjamin Cabrera
#99-A-2599
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

Lynetta M. St. Clair, Esq.
Assistant District Attorney
Office of the District Attorney of Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 590-6523 (fax)

29